IN THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

RONALD SCOTT MITCHELL, Pro Se, of )
2939 Van Ness Street N.W., Apt. 640, )
Washington, DC 20008 )
(202) 340-0434, )
                 )

           Plaintiff

**Case: 1:18-cv-01965   (F Deck)**
**Assigned To : Chutkan, Tanya S.**
**Assign. Date : 8/22/2018**
**Description: Pro Se Gen. Civil**

          v.

JAMES N. MATTIS )
Secretary of the Department of Defense )
U.S. Department of Defense, )
                 )
KIRSTJEN M. NIELSEN )
Secretary, United States Department Of )
Homeland Security, )
                 )
SERVICE PARTNERS )
ASSOCIATES )
                 )
Serve: )
      Randolph D. Alles )
      Director of the U.S. Secret Service )
      1600 Pennsylvania Avenue N.W. )
      Washington, DC 20500 )
                 )

          Defendants )

## COMPLAINT

1.      Pursuant to 28 U.S.C. § 1346(b) and other federal law, Plaintiff Ronald Scott

Mitchell hereby files this civil action against Service Partners Associates (SPA), the

Department of Homeland Security, and the Department of Defense (DoD) for damages

and injunctive relief for violations of his constitutional rights, illegal surveillance,


RECEIVED

AUG 2 2 2018

Clerk, U.S. District and
Bankruptcy Courts

invasion of privacy, attempts on his life, and tortious interference resulting in economic injury.

## JURISDICTION AND VENUE

2.      Pursuant to 28 U.S.C. § 1331, the United States District Court for the District of Columbia has subject matter jurisdiction to hear cases based on federal law or the U.S. Constitution (as alleged herein).  Pursuant to 28 U.S.C. § 1367(a), the United States District Court for the District of Columbia has supplemental jurisdiction over the common law claims and those based on the D.C. Code because these claims are so related to the violations of federal law that they form "part of the same case or controversy."

3.      The United States District Court for the District of Columbia has personal jurisdiction over all defendants because the federal government defendants maintain addresses and offices in Washington, DC.  Service Partners Associates (SPA) is a private corporation that maintains a presence in the metropolitan Washington, DC area where many of its employees operate.

4.      Pursuant to 28 U.S.C. § 1346(b), plaintiff seeks monetary damages for several torts committed by defendants.  Pursuant to 28 U.S.C. § 1402(b), the U.S. District Court for the District of Columbia Court is the appropriate venue because lawsuits invoking 28 U.S.C. § 1346(b) may be prosecuted in the U.S. district court in the judicial district where the tortious acts occurred and many of the torts alleged herein occurred in the Washington, DC metropolitan area.

## BACKGROUND

5.      At the direction of the U.S. Secret Service and the Pentagon, Service Partners Associates conducted an investigation and information containment operation involving plaintiff that limited his economic earning power, damaged his reputation, invaded his privacy, and resulted in the death of several members of his friends and family. Defendants are operating as though plaintiff were demonstratively hostile to the interests of the United States even though plaintiff has never been armed, made no threats against the United States or its local or national political leaders, conducted no clandestine or overt intelligence gathering, provided no material support to the enemies of the United States, and never worked for a foreign government or group.

6.      Service Partners Associates (SPA) conducts illegal operations that fall outside of the U.S. Secret Service's statutory powers and responsibilities, such as information containment operations and investigation, diversion, and removal of individuals who might damage the specter of the Office of the President of the United States. Based on plaintiff's demographics, credentials, race, financial resources and income, and personal connections (and those of his friends and relatives), defendants generated a map of where plaintiff might be in two, five, ten, fifteen, and twenty years. Defendants gave SPA and agents direction about who and what are to be plaintiff's available relationships, employment and residential options, and any future education. In addition, many of plaintiff's friends and relatives have also been similarly analyzed and monitored. In directing and conducting these operations, defendants' objective is to injure plaintiff economically in order to provide a level of certainty about plaintiff's future profession,

residence, income, and relationships – decisions which fall outside of the purview of the government or private contractors of the government.

7.     Over the last eight years, the investigation and operation has gotten progressively more aggressive; defendants (and their agents) have become plaintiff's medical professionals, service providers, mail carriers, classmates, and colleagues, not to mention the spouses of several members of plaintiff's friends and family.  Defendants have used private civilians and international agents to skirt U.S. law and domestic reporting responsibilities.  The use of DoD personnel to conduct a law enforcement investigation on domestic soil in the absence of an emergency or request from city and state officials violates the Posse Comitatus Act.

## ATTEMPTS ON THE LIFE OF PLAINTIFF

8.     Defendants have made several attempts on the life of plaintiff and members of his friends and family.  Defendants maintain a calendar of dates when members of plaintiff's friends, professional colleagues, relatives, and extended family members have been or will be killed.  Already, defendants have participated in the deaths of Dr. Gene Emanuel (2011), Laura Ann Johnson (2012), Gary Turnage (2012), Robert Brown (2013), Kristina Rodriguez (2013), Dr. Kenneth C. Edelin (2013), Louise Olivi (2014), Rita Johnson-Piett (2015), Dr. Evelyn Washington-Hunter (2015), Vernon P. Thomas (2016), Tilla Lamb (2016), Mary Truxillo (2016), Lakshmisri Chatterjee (2016), Alice Washington (2017), Abraham B. Washington (2017), and several others.  Defendants posed as medical professionals who provided negligent medical care and/or illness-causing agents.

9.      While plaintiff traveled in Fort Worth, TX, there were two attempts to kill plaintiff and members of his family.  On Friday, March 10, 2017, plaintiff exited the parking lot of Abuelitos restaurant on Hulen Street in Fort Worth, TX in a car.  As plaintiff approached the ramp onto a busy bi-directional six-lane road, a large pickup truck pulled into the entrance and blocked the view of oncoming traffic.  It stayed in that position for nearly a minute waiting for plaintiff to pull out where he could not see.  By blocking plaintiff's view, the pickup truck driver hoped to force plaintiff into oncoming traffic where he would have been killed in a serious automobile accident.

10.     On the evening of either March 12 or 13, 2017 between 6:30 PM – 7:00 PM, plaintiff was driving in a red Hyundai hatchback on Interstate 20 (I20) West near the intersection of I20 and Highway 820 near Forest Hills, TX.  A grey Dodge Durango SUV suddenly pulled into plaintiff's lane with no warning or turn signal and a large orange 18-wheeler truck pulled up behind plaintiff's car at the same time.  The drivers attempted to sandwich plaintiff's car between the SUV and the freight truck, which would have killed the occupants without plaintiff's quick evasive action.  These attempted car accidents are in addition to other attempts to take the life of plaintiff or his family that were ordered and coordinated by defendants.  In addition, there have been several car accidents (and multiple other attempts to cause vehicular damage) in the Washington, DC metropolitan area.

**COUNT #1: Defendants planned and caused the death of several relatives and extended family members, made several attempts on the life of plaintiff and his still living family members, and are likely to try again to squelch anything connected to**

5

plaintiff.  **Plaintiff requests damages and sufficient funds to protect himself and his family.**

### INFORMATION, INCOME, AND OPPORTUNITY CONTROL

11.     Defendants dictate the opportunities available to plaintiff through information, income, and opportunity control tactics.  Defendants have used "false friends" (actors and actresses, models, escorts, and undercover members of the intelligence and law enforcement communities) in this operation.   Defendants also contacted well-placed civilians to manage every relationship and opportunity available to plaintiff since 2010. Defendants' decisions fall outside of the scope of the legal purview of federal agents and private corporations and have resulted in serious economic damage to plaintiff, requiring him to rely on public assistance.   Already, every city in which plaintiff expressed an interest in has been loaded with well-connected individuals who can take employment opportunities and sour the opinion of plaintiff in important circles of potential financiers, clients, and professional colleagues in order to control the opportunities available to plaintiff.

12.     Defendants illegally obtained plaintiff's "individually identifiable health information" and disclosed it to their employees, clients, and members of the intelligence community without plaintiff's authorization and in contravention of 42 U.S.C. § 1320d-6(a)(2) (penalizing the illegal acquisition of individually identifiable health information). The information was collected for the purpose of using "individually identifiable health information for . . . malicious harm," 42 U.S.C. § 1320d-6(b)(3), and tortious acts.

13.     Defendants manipulated the information on plaintiff's credit reports, including inserting false mortgage applications that appeared in credit reports (first noticed in 2014). Because it looks like plaintiff's credit is overextended, this fraudulent information reduces plaintiff's access to credit. Deliberately inserting false information onto plaintiff's credit report constitutes fraud because it intentionally misleads potential sources of credit or capital (and the credit reporting agencies) about whether and how much credit plaintiff qualifies for. Fraudulent information inserted onto plaintiff's credit report frustrates plaintiff's attempts to secure an accurate credit record. Since 2010, plaintiff unsuccessfully used two credit repair companies (Lexington Law and FMK, Inc.) to correct false formation on his credit report.

14.     Defendants sabotaged plaintiff's reputation and altered information in important databases of plaintiff's friends and classmates. Defendants deleted plaintiff's account and login credentials from a database of alumni of Phillips Exeter Academy – a potentially rich source of personal connections and professional referrals. These disclosures lowered the chance that plaintiff's friends and colleagues would utilize his legal services in the future. Defendants also insulated plaintiff from friends or colleagues who are potential sources of financial assistance and employment opportunities.

15.     Defendants managed access to plaintiff's internet communications and publications. Plaintiff published two websites in the last two years. Defendants chose who could access plaintiff's websites and what information plaintiff would receive from website visitors. Several website visitors were not able to see website content and graphics published by plaintiff. At least one person submitted their email address to receive information from the website but plaintiff never received this request nor that of

other website visitors.   Plaintiff's websites still may not be publicly accessible by individuals outside of plaintiff's friends and family members (or others explicitly directed to the website by plaintiff or one of his close friends or relatives).   Managing plaintiff's internet communications and access to his publications violates plaintiff's First Amendment rights.

16.   Defendants blocked access to internet services purchased by plaintiff.   After ordering a treatise on national security law in the summer of 2018, plaintiff's website content builder for the aforementioned websites could not be accessed for a brief period. During the same week, plaintiff's Google email account and Paypal account were hacked and unauthorized charges (mysteriously categorized as regular debits) appeared on plaintiff's debit card, requiring a new card to be issued.   Defendants' actions were motivated by a desire to intimidate plaintiff so that he would not seek legal recourse.

17.   Defendants altered plaintiff's social media accounts and the search results available to interviewers, human resources professionals, and hiring partners at prospective employers which received an application for employment from plaintiff. Plaintiff updated and composed a professional LinkedIn profile.   Defendants limited access to this revised profile and substituted the uncorrected version to prospective employers and other well-placed individuals.   Plaintiff could access the page he composed on his own computer in his home but not from other computers, meaning friends, relatives, colleagues, and potential employers saw a different page than what plaintiff could see.   The error-filled LinkedIn profile decreased plaintiff's appeal to prospective employers, costing him employment opportunities.   Alteration of plaintiff's

LinkedIn profile violates plaintiff's First Amendment right to freedom of speech and caused economic harm to plaintiff.

18.     Defendants caused economic injury to plaintiff by controlling his employment opportunities.  Plaintiff graduated cum laude and ranked 10th of 130 law students in the Class of 2016 of Howard University School of Law.  Although Howard consistently graduates twenty or more students who take positions at large law firms[1] every year, plaintiff's eighty job applications did not yield one viable employment opportunity. Approximately 90 percent of all Howard law graduates in the top 25 students in plaintiff's class accepted a position at a large law firm or a clerkship, including some who did not have as high a grade point average (GPA) as plaintiff.  Despite a degree from Phillips Exeter Academy, Yale University, and Howard University School of Law, plaintiff's extensive job search did not yield one viable opportunity except a position that initially paid $10 per hour.  Plaintiff's online applications to law firms were altered so that his resumé appeared lower in the electronic system's ranking than an honest electronic evaluation would have yielded.  Many job applications were deleted or yielded no response or consideration.  Defendants' alteration or deletion of correspondence between plaintiff and large law firms constitutes tortious interference with plaintiff's economic rights.

19.     Defendants interfered with an apartment rental application in order to enforce a virtual cordon that eliminated any residential option near the Capitol buildings.  In December 2017, plaintiff applied for an apartment at the Severna on K, an apartment building located near the intersection of North Capitol Street and K street in Northwest

---

[1] For purposes of this complaint, large law firms are those with at least eighty or more attorneys nationwide.

Washington, DC.  The application process normally takes 3-5 business days to get a decision.  Instead, plaintiff endured seven weeks of repeated questions about plaintiff's financial resources.  Through repeated questions, the leasing agent used the pretext of confirming the details of plaintiff's financial transactions to divert plaintiff from living anywhere near the Capitol.  This virtual cordon interferes with plaintiff's liberty and property interests without due process of law.  Eventually, plaintiff had to accept another residential option which was more expensive.

20.    Federal government defendants are operating outside of their statutory purview and using tactics reserved for parties demonstratively hostile to the interests of the United States which does not describe plaintiff.

**COUNT #2: Defendants' opportunity, information, and income control activities have damaged plaintiff economically for which he seeks damages.**

## ILLEGAL SURVEILLANCE

21.    Defendants have illegally conducted an extensive and continuous surveillance operation involving plaintiff and his friends and family members.  The surveillance is not in keeping with warrant procedures under the Foreign Intelligence Surveillance Act or 18 U.S.C. § 2518.  Defendants maintain a 24-hour surveillance operation of plaintiff and his close friends and family members, including monitoring plaintiff's movements, conversations, social media accounts, telephone calls, emails, internet sessions, and all other interactions by or with plaintiff.  Defendants used information gained through surveillance to coordinate and commit criminal and tortious acts on plaintiff, and

disclosed the information to members of the intelligence community knowing the information was obtained illegally.

22.     Defendant have used "false friends" extensively in this operation, including using information communicated by or to plaintiff in private or in confidence in public interactions designed to ensure that plaintiff knows that he has no privacy.  These tactics constitute psychological warfare and were calculated to offend and isolate plaintiff. Some statements were veiled threats against the well-being of plaintiff and his friends and family.  The use of private information illegally collected constitutes a violation of plaintiff's constitutional right to privacy as the public disclosures are highly offensive to the senses of an ordinary and reasonable person.

23.     Defendants' monitoring and manipulation of plaintiff and his friends and family members is "willful," open, and notorious. Plaintiff has never been armed, made no threats against the United States or any American national or local politicians, provided no material support to the enemies of the United States, conducted no overt or clandestine intelligence gathering activities, and never worked for a foreign government or group.

**COUNT #3: Defendants are using tactics of psychological manipulation to ensure that plaintiff knows that he is followed and overheard at all times.  Plaintiff seeks damages for an illegal surveillance operation.**

**VIOLATIONS OF PRIVACY**

24.     Defendants deliberately violated plaintiff's privacy repeatedly.  Privacy is the right to "be let alone."  Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, Harv. L. Rev. 193 (1890).  The cause of action for invasion of privacy includes four torts:

"(1) intrusion upon one's solitude or seclusion; (2) public disclosure of private facts; (3) publicity that places one in a false light in the public eye; and (4) appropriation of one's name or likeness for another's benefit." Doe v. Bernabei & Wachtel, PLLC, 116 A.3d 1262, 1266 (D.C. 2015) (citing Wolf v. Regardie, 553 A.2d 1213, 1217 (D.C. 1989)). The tort of intrusion on seclusion consists of three elements: "(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff had secluded himself [or herself], or into his [or her] private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person." Brittany Spencer v. District of Columbia, 168 F. Supp. 3d 114, 122 (D.D.C. 2016) (citing Danai v. Canal Square Assoc., 862 A.2d 395, 400 (D.C. 2004)).

25.    Defendants invaded plaintiff's seclusion on multiple occasions by trespassing in his apartment, inspecting mail, inspecting his tangible personal property, listening to or reading plaintiff's communications, and tracking his finances. The elements of the tort of intrusion on seclusion are met because (1) entrance into plaintiff's apartment is "physical intrusion" (2) into plaintiff's home that was (3) "highly offensive" since the entry was not authorized by plaintiff. Plaintiff's home and his private communications are part of the "zone of seclusion which society considers sacrosanct and insulated from the peering eyes and cocked ears." Alvarado v. Rainbow Inn, Inc., 312 F.R.D. 23, 32 (D.D.C. 2015) (citing Wolf v. Regardie, 553 A.2d 1213, 1220 (D.C. 1989)).

26.    Beginning in April, 2010, defendants have continuously and intentionally intercepted the oral, written, and electronic communications of plaintiff, his relatives, friends, and colleagues (which when done by SPA is illegal). These intercepted

communications violated plaintiff's privacy as well as that of his friends, relatives, and colleagues.   In addition, SPA did not follow the procedures for authorization of interception of wire or oral communications as laid out in D.C. or federal law because SPA is not a "law enforcement officer" as required by both Codes.   A FISA warrant (if issued) should have expired a long time ago as it became very obvious that plaintiff was not an agent or employee of a foreign government or foreign group or power nor was plaintiff gathering intelligence.

27.     Since April 2010, plaintiff's new tangible possessions were searched carefully. These searches violate plaintiff's Fourth Amendment right to be free from "unreasonable searches."  U.S. Const. amend. IV.  As these illegal searches turned up no answers, the real and personal property of friends and family members were also searched for clues, which are gross violations of the privacy of individuals who have no malicious plans towards the United States or its political leaders nor do they gather intelligence nor provide material support for armed insurgency by domestic or foreign entities.  In fact, plaintiff has never even owned a gun.  The searches of plaintiff's belongings violate plaintiff's privacy because plaintiff did not authorize SPA or the government defendants (nor their contractors) to conduct a search of his belongings or of his residence.

28.     Defendants made multiple unsolicited robo-calls to plaintiff's cellular phone number.  As of mid-2017, Plaintiff had not participated in any contest or advertisement which might have added his number to a telemarketer's list.  Plaintiff's family members have also received these robo-calls.

29.     Plaintiff's personal computer software is hosted remotely, allowing someone to insert files and to track all keystrokes, internet sessions, or other communications.  This surveillance happens at plaintiff's job site as well.

**COUNT #4: Defendants violated plaintiff's privacy willfully and repeatedly for which he seeks damages.**

## TRESPASSING AND MEDICATION TAMPERING

30.     Defendants have repeatedly replaced plaintiff's medicine with adulterated medication.  Plaintiff's prior and current medication was and is adulterated under the meaning of § 48-103(1) of the D.C. Code because the ingredients "differ from the standard of strength, quality, or purity laid down" in the United States Pharmacopoeia. Several years ago, plaintiff discovered that his medication had a different melting point than the prescribed medication raising the ante of defendant's information containment operation.   Tampering with the contents of the pill bottles puts plaintiff's health in danger.

31.     Defendants have made attempts to conceal their provision of adulterated medicine.  On at least one occasion, defendants entered plaintiff's apartment without his permission and removed altered medicine to prevent it from being found.   SPA's trespassing is illegal because plaintiff did not grant permission to defendants to enter his dwelling or to remove any object.

32.     In 2017, plaintiff participated in a drug test at a specimen collection facility. While being tested, defendants entered his apartment and replaced his medicine with the wrong prescription.  Tampering with the contents of the medication puts plaintiff's health

in danger.   Trespassing in plaintiff's apartment violates plaintiff's privacy because plaintiff did not grant permission to defendants to either enter his dwelling or to remove any object.   Plaintiff's medication was adulterated under the meaning of § 48-103(1) of the D.C. Code because it "differs from the standard of strength, quality, or purity laid down" in the United States Pharmacopoeia.

33.     Defendants attempted to infect plaintiff with an illness-causing agent by replacing his medicine.   In 2017, while plaintiff underwent a Magnetic Resonance Imaging (MRI) scan of his brain, someone entered plaintiff's apartment and replaced his bottle of Flonase (an inhaler used to treat allergies) with something that caused a viral head cold, which required a trip to an emergency room two days later.   Substituting the inhaler with one with an illness-inducing substance with identical markings and physical size endangers plaintiff's health.   Trespassing invades plaintiff's privacy because plaintiff did not authorize defendants to enter his apartment.   The replacement inhaler's effect could have killed plaintiff if ingested in the right dose.

34.     Defendants have entered plaintiff's residence many other times for searches of new possessions or tampering with plaintiff's medicine.

**COUNT #5: Defendants trespassed in plaintiff's living quarters.   Defendants repeatedly tampered with plaintiff's medication.   Plaintiff's seeks damages for these incursions on his privacy and threats to his health.**

**PRAYER FOR RELIEF**

35.     Plaintiff seeks the following relief:

1) A permanent injunction of all defendants' activities involving plaintiff, his family, colleagues, and friends;

2) An *in camera* and *ex parte* examination of defendants' application(s), if any, for surveillance of plaintiff to determine if the operation was lawfully authorized and proper minimization procedures were followed;

Damages in the amount of $390,304,124 calculated as follows:

3) Payment of the fees for 24/7/365 in-home security guards and an accompanying personal body guard for 50 hours per week for life for plaintiff and the 22 other households of members of his family (estimated at $379,391,624);

4) Two years of salary at a large law firm ($160,000 + $170,000 = $330,000)[2] for preventing plaintiff's career in BigLaw at a large law firm;

5) Pursuant to 18 U.S.C. § 2520(c)(2)(B), statutory damages from SPA for intentional interception of oral and electronic communications calculated as follows: $100 per day x 1,095 days = $109,500. The number of days comes from the three-year statute of limitations in D.C. Code § 12-301(8);

6) Pursuant to 50 U.S.C. § 1810(a), statutory damages for illegal electronic surveillance by defendants calculated as follows: $100 per day x 730 days = $73,000. The number of days comes from the two-year statute of limitations in 28 U.S.C. § 2401;

7) Damages in the amount of $10.4 million for the combined effect of an aggressive campaign to impoverish, silence, and intimidate plaintiff which included:

---

[2] National Association of Legal Placement, Associate Salary Survey, http://www.nalp.org/uploads/Research/AssociateSalarySurveyReportPressRelease.pdf.

i)   Having his personal circumstances (e.g., income, credit, employment, residential, relationship, and medical options) meted out by government agents, private contractors, and colluding civilians in such a way as to reduce plaintiff's civil right to participate in the Washington, DC community;

ii)   Willful and frequent violations of plaintiff's privacy including subjecting his residence and belongings to searches that violate the Fourth Amendment;

iii)   Willfully using information acquired about plaintiff illegally against plaintiff.   Pursuant to 50 U.S.C. § 1810(b), plaintiff seeks punitive damages from SPA for its part in these activities;

iv)   Blocking access to internet services, interfering with plaintiff's communications, manipulating plaintiff's social media accounts, and restricting access to plaintiff's publications;

v)   Tortious interference with plaintiff's job applications and income-related opportunities;

vi)   Defendants' conspiracy to impoverish plaintiff resulted in plaintiff being unable to afford a vehicle or make substantial progress in paying old debts.   Despite demonstrating sufficient academic merit to make it at the top BigLaw law firms, defendants' imposed limitations on plaintiff's employment and income opportunities forced plaintiff to sometimes choose which medication to fill and when.   Plaintiff remains on public

assistance to meet basic needs and has relied on family for unexpected increases in living expenses and employment;

vii)    Ingesting altered medication with negative long-term health effects;

viii)   Multiple attempts on the life of plaintiff;

ix)     Pervasive paranoia that includes: a persistent inability to completely trust anyone plaintiff has met since 2010 when the operation began; living with the blinds lowered for two years to reduce a sniper's visibility; carrying medicine on his person to reduce the chance of poisonous substitutes inserted into the bottles; living with no heat during the winters of 2017 and 2018 for fear of an airborne illness emanating from his air conditioning unit; and frequent concern about his personal health and safety.

36.     Given the government's role in the alleged actions, plaintiff requests that all damages be free from any taxes.


**DATED: August 22, 2018**

Ronald Scott Mitchell
2939 Van Ness Street N.W.
#640
Washington, DC 20008
(202) 340-0434
mitchellrscott@gmail.com

## CERTIFICATE OF SERVICE

Secretary James N. Mattis
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

Secretary Kirstjen M. Nielsen
United States Department of Homeland Security
Washington, DC 20528

Service Partners Associates
c/o Mr. Randolph D. Alles
Director of the U.S. Secret Service
1600 Pennsylvania Avenue N.W.
Washington, DC 20500

Mr. Jeff Sessions
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Ms. Jessie K. Liu
U.S. Attorney for the District of Columbia
555 4th Street N.W.
Washington, DC 20530